UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| SEAN CERTEZA, *Prisoner Identification Number 411-779, SID Number 257-4895,*<br><br>Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC.,[1]<br>CRYSTAL JAMISON, P.A.;<br>DR. ASHOK KRISHNASWAMY;<br>DR. MAHBOOBEH MEMARSADEGHI;<br>ERWIN ALDANA, REGIONAL MEDICAL DIRECTOR;<br>RICHARD MILLER, WARDEN;<br>PATRICIA CASPAR, ADMINISTRATIVE REMEDY PROCEDURE COORDINATOR;<br>and<br>MONICA STALLWORTH, M.D.,<br><br>Defendants. | Civil Action No. TDC-18-1791 |

**MEMORANDUM OPINION**

Plaintiff Sean Certeza, an inmate currently incarcerated at Maryland Correctional Institution-Hagerstown ("MCI-H") in Hagerstown, Maryland, filed a self-represented Complaint pursuant to 42 U.S.C. § 1983 alleging deliberate indifference to a serious medical need, in violation of the Eighth Amendment to the United States Constitution based on allegedly inadequate medical treatment of a wrist injury sustained while he resided at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland. Defendants include Wexford Health Sources, Inc. ("Wexford"), the

---

[1] The Clerk shall amend the docket to reflect the proper title and spelling of the Defendants' names, as noted in this caption.

contractor providing medical services at RCI; Dr. Mahboobeh Memarsadeghi; Physician's Assistant Crystal Jamison ("PA Jamison"), Regional Medical Director Erwin Aldana; and Dr. Monica Stallworth, all of whom work for Wexford (collectively, the "Medical Defendants"); and Dr. Ashok Krishnaswamy, an orthopedic surgeon. The Complaint also names as Defendants RCI Warden Richard Miller and RCI Administrative Remedy Procedure ("ARP") Coordinator Patricia Caspar (collectively, the "Correctional Defendants").

The Medical Defendants and the Correctional Defendants have each filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, accompanied by affidavits and exhibits. Certeza has not filed a memorandum in opposition to the Motions. Having reviewed the submitted materials, the Court concludes that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Medical Defendants' Motion will be granted in part and denied in part. The Correctional Defendants' motion will be granted.

## BACKGROUND

On May 20, 2015, Certeza injured his wrist while playing softball. His wrist was deformed and swollen, and Certeza was in severe pain and could not move his fingers. PA Jamison examined Certeza, assessed that Certeza had sustained a radius/ulnar fracture, and applied a splint. Certeza was given an injection of Nubain, a pain reliever, and an x-ray was ordered. The x-ray, which was read the next day, revealed an acute fracture. When Certeza informed PA Jamison that Nubain was ineffective in relieving his pain, Certeza was given an injection of Toradol, and additional medications were prescribed. On May 21, 2015, Dr. Colin Ottey examined Certeza and arranged for an orthopedic consultation with Dr. Krishnaswamy, an orthopedic surgeon.

On May 27, 2015, the orthopedic consultation was approved. Although Certeza received an appointment to see Dr. Krishnaswamy at Bon Secours Hospital on May 29, 2015, the visit was

postponed due to a scheduling error. On June 5, 2015, more than two weeks after the injury, Certeza was seen by Dr. Krishnaswamy, who diagnosed an unstable fracture that would require outpatient surgery consisting of an open reduction internal fixation procedure ("ORIF") with the insertion of a compression plate and screws and the application of a splint. This surgery was to be done as soon as possible to avoid healing in malunion.

On June 11, 2015, Certeza reported that his medication regimen was ineffective. PA Jamison met with him on June 17, 2015 to reapply the splint and submit his surgery consultation request. Certeza's wrist surgery was approved on July 22, 2015. Dr. Krishnaswamy performed the surgery on September 1, 2015. Dr. Krishnaswamy observed that by the time that the surgical authorization was obtained and the surgery was performed, Certeza's wrist was already healing in malunion.

On September 2, 2015, Certeza was prescribed acetaminophen with codeine for pain, and an orthopedic consultation was requested. On September 30, 2015, to address continuing pain, Certeza was prescribed Tramadol.

On November 3, 2015, PA Jamison removed and re-splinted Certeza's cast. When Certeza complained of pain, he was told that his condition would be discussed with the regional medical director. On November 4, 2015, Certeza's orthopedic follow-up consultation was approved.

On November 13, 2015, Certeza was seen by Dr. Krishnaswamy. Although the surgical wound had healed well, x-rays revealed that the fracture was healing, and the range of motion in Certeza's left wrist was good, there were signs of dislocation in the joint. Dr. Krishnaswamy advised Certeza to continue range-of-motion exercises and to wear a wrist splint. Dr. Krishnaswamy planned to remove the plate and screws in four to six months. He noted that

reconstruction of the radio-ulna joint might be necessary and requested to see Certeza again in six weeks.

On May 23, 2016, Certeza visited sick call to complain that everything he did triggered wrist pain, which at times was at 10 on scale of 1 to 10. He said that he had trouble tying shoes and getting dressed. The pain medication was not working. On May 31, 2016, a consultation was ordered for Dr. Krishnaswamy to remove the plate from his wrist. Certeza was prescribed Tramadol for pain.

On June 11, 2016, Certeza was seen by Dr. Stallworth. His Tramadol prescription was renewed through September 30, 2016. He saw Dr. Stallworth again on August 31, 2016 and complained that he was unable to play sports or pick up a cup due to wrist pain. Dr. Stallworth resubmitted the request for a consultation with Dr. Krishnaswamy to remove the plate.

On September 20, 2016, PA Jamison noted that the consultation with Dr. Krishnaswamy still had not been scheduled and sent an email to see if the consultation request had been addressed. PA Jamison saw Certeza again on December 6, 2016 and noted that Certeza remained in pain and had decreased range of motion in his wrist. Aware that Dr. Krishnaswamy had stated that the hardware in Certeza's wrist needed to be removed to prevent infection, malunion, and prolonged recovery, she resubmitted the consultation request.

The orthopedic consultation was finally approved on December 14, 2016. During a January 17, 2017 telemed conference, Certeza, Dr. Memarsadeghi, and Dr. Krishnaswamy discussed an outpatient procedure to remove the hardware and to perform a modified Darrach Procedure to address the wrist deformity, pain, and instability of the joint. A surgical consultation request was approved on January 25, 2017.

On January 27, 2017, Certeza was seen by Dr. Memarsadeghi at the chronic care clinic and was told that the procedure had been approved and would require splinting for four weeks as well as physical therapy. Certeza's Tramadol prescription was renewed. The prescription was renewed again by Dr. Memarsadeghi on April 21 and July 18, 2017.

On August 31, 2017, Certeza complained to Dr. Maksed Choudry at the chronic care clinic that he had chronic pain, could not use his wrist properly, and had not yet been scheduled for the surgery that had been approved in January. On October 14, 2017, Certeza was seen again by Dr. Stallworth, who renewed his Tramadol prescription. On October 16, 2017, PA Jamison conducted a pre-operative evaluation and cleared Certeza for surgery.

On January 11, 2018, Dr. Memarsadeghi resubmitted the request for wrist surgery that had been approved the previous year on January 17, 2017. On February 9, 2018, however, a consultation was approved not for surgery, but for another orthopedic telemed conference. That conference, which included Certeza, Dr. Memarsadeghi and Dr. Krishnaswamy, occurred on March 14, 2018. Dr. Krishnaswamy acknowledged that Certeza remained in pain and determined that the plate and screws would be removed and a modified Darrach Procedure performed within four weeks after authorization. On April 12, 2018, almost two years after it was originally supposed to occur, Dr. Krishnaswamy conducted the procedure to remove the hardware, but the Darrach Procedure was deferred to see if the hardware removal alone would decrease Certeza's pain.

On April 22, 2018, Certeza reported that the surgical wound was not healing well. The wound was cleaned and dressed. The following day, April 23, 2018, Certeza was prescribed Tylenol-codeine No. 3 and an antibiotic, Keflex, for infection. On April 25, 2018, Dr. Memarsadeghi examined the wound, renewed Certeza's Tramadol prescription, and noted that a

consultation with Dr. Krishnaswamy should be scheduled to occur one week later. The consultation was not approved until May 1, 2018.

On June 13, 2018, Certeza filed his Complaint in this Court. On June 26, 2018, Certeza was transferred from RCI to MCI-H. On July 6, 2018, Dr. Aldana, the Regional Medical Director, saw Certeza for complaints of chronic pain and weakness in his left wrist. An x-ray was ordered, pain medication prescriptions were renewed, and Certeza was referred to orthopedics for follow up. On July 20, 2018, the orthopedic consultation was deferred to obtain information on how Certeza's condition impacted his activities of daily living ("ADL"). The consultation was approved on August 1, 2018.

On September 7, 2018, Certeza was seen by Dr. Lawrence Manning, an orthopedist. Dr. Manning noted that Certeza had a wrist deformity and radial deviation of the hand, a decreased range of motion and grip strength, and pain over the median nerve. An x-ray taken on July 11, 2018 showed shortening of the radius bone and other changes indicative of malunion of the left distal radius fracture. Dr. Manning recommended a splint and referral to a hand surgeon for possible surgical intervention and consideration of a Darrach Procedure. Dr. Manning also recommended that Certeza receive a different non-steroidal anti-inflammatory drug, or NSAID, for pain. On October 15, 2018, the NSAID Naprosyn was prescribed for pain. On October 24, 2018, the request for a surgical evaluation was approved. On December 19, 2018, Dr. Krishnaswamy again evaluated Certeza and again recommended a modified Darrach Procedure. The outcome of any subsequent surgery has not been provided. The parties do not dispute that Certeza's wrist is deformed. *See* Photograph, ECF No. 4-3 at 92.

During this time period, Certeza submitted Administrative Remedy Procedure grievances ("ARPs") relating to his medical treatment to the Warden on the following dates: May 29, 2015;

July 28, 2015; November 3, 2015; January 7, 2017; and August 25, 2017. These ARPs complained about delays in Certeza's surgery and treatment and about issues relating to Certeza's pain medication prescriptions. As discussed below, one of these ARPs was withdrawn by Certeza, one was procedurally dismissed, and three were investigated, with two found to be meritorious in whole or in part.

## DISCUSSION

Certeza alleges that the Medical Defendants collectively failed to provide him constitutionally adequate medical treatment for his wrist fracture. The Medical Defendants assert that the claims against Wexford cannot proceed because they amount to supervisory liability claims that are not cognizable under § 1983. The Medical Defendants also assert that Certeza's claims are barred in part by the relevant statute of limitations. Lastly, they assert that Certeza cannot show that they were deliberately indifferent to his medical needs.

Certeza alleges that the Correctional Defendants failed to respond appropriately to his complaints against the Medical Defendants about their treatment of his injury. The Correctional Defendants seek dismissal on the grounds that the Eleventh Amendment bars suit against them in their official capacities, that they are not liable absent personal participation in the alleged violations, that there was no denial of medical care, and that they responded to Certeza's administrative grievances in a timely and proper manner.

### I. Legal Standards

Both Motions seek either dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. When deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent

that grounds for dismissal are based solely on the contents of the Complaint, the Court may dismiss the Complaint if it does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motion and the notice by the Court to Certeza advising him of the provisions of Rules 12 and 56. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district

8

court on notice of the reasons why summary judgment is premature. *See Harrods, Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002); *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011). Here, Certeza has not filed a Rule 56(d) affidavit or otherwise requested discovery in this matter, so the Court will construe the Motions as seeking summary judgment as to arguments on which it must consider the attached exhibits.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Because Certeza is self-represented, his submissions are liberally construed. *See Erickson*, 551 U.S. at 94. Nevertheless, the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526.

## II. The Correctional Defendants

### A. Eleventh Amendment Immunity

The Correctional Defendants assert that to the extent that they are sued in their official capacities, they are immune to suit under the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. Amend XI. The Eleventh Amendment thus bars suits against a state in federal court unless the state has waived its sovereign immunity or Congress has abrogated its immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). Congress did not abrogate the states' sovereign immunity when it enacted § 1983, and Maryland has not waived its sovereign immunity for claims brought in federal court. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66 (1989) (noting that while "Section 1983 provides a federal forum to remedy many deprivations of civil liberties," "[t]he Eleventh Amendment bars such suits unless the State has waived its immunity"); *Dyer v. Md. State Bd. of Educ.,* 187 F. Supp. 3d 599, 611 & n.16 (D. Md. 2016).

A suit against a state official in that person's official capacity is the equivalent of a suit against the State itself. *Will,* 491 U.S. at 71 (internal citation omitted). To the extent, therefore, that Certeza is seeking damages against the Correctional Defendants in their official capacities, he has asserted a claim against the State of Maryland. *See* Md. Code Ann., State Gov't § 12-101(a) (2015) (defining "state personnel"). Thus, Certeza's damages claim against the Warden and the

ARP Coordinator in their official capacities is barred by the Eleventh Amendment. *See Pennhurst*, 465 U.S. at 100–01.

### B.     Supervisory Liability

To the extent that Certeza seeks damages from the Correctional Defendants in their individual capacities, his claims also fail. Defendants Miller and Caspar argue that they cannot be liable for the conduct of contractual health care providers not subject to their supervision or control. It is firmly established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). For § 1983 claims, liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citation omitted). A viable claim for supervisory liability under § 1983 thus requires plausible allegations that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Here, where neither Warden Miller nor Caspar is responsible for directly supervising the contract medical personnel who provide health services to Maryland prisoners, they cannot be held liable for their actions under a supervisory liability theory.

Nor does the record support a claim that either Warden Miller or Caspar violated Certeza's constitutional rights in their handling of Certeza's grievances about his medical care. Certeza filed his first ARP relating to his medical treatment, ARP No. ARP-RCI-0315-15, on May 29, 2015 complaining about the delay in treatment. However, he withdrew the ARP on June 17, 2015, such that there was no need for a full investigation. His July 28, 2015 grievance, ARP No. RCI-0446-15, complaining about the delay in surgery, was dismissed on August 26, 2015 after investigation showed that he was seen by an orthopedic surgeon on June 8, 2015 and was scheduled for surgery. His third grievance, ARP No. RCI-0651-15, submitted on November 3, 2015, objected to a delay in scheduling a follow-up visit to the orthopedic surgeon and expressed the need to reorder pain medication. This ARP was found to be meritorious in part because a consultation request had not been acted upon. On that occasion, the consultation order was resubmitted, pain medication was found to have been provided, and a pain evaluation was found to have been requested and pending.

On January 7, 2017, Certeza submitted ARP No. RCI-000617, complaining that Dr. Stallworth had prescribed Tramadol, a pain medication, but failed to follow up by renewing the prescription, which had expired. On February 1, 2017, the grievance was deemed meritorious, as the lapse in medication was caused by a failure on the part of medical staff to make a referral. The prescription was renewed. Certeza's final grievance, ARP No. RCI-0492-17, filed on August 25, 2017 and questioning when his plate removal surgery would occur, was dismissed for procedural reasons pending resubmission.

Thus, the record reflects that Certeza's grievances were addressed by the Correctional Defendants, who directed investigations of his medical concerns and twice discovered errors on the part of medical personnel regarding either Certeza's pain medication prescriptions or the timeliness of orthopedic consultations. Under these circumstances, the Correctional Defendants

12

are entitled to summary judgment. *See Atkins v. Md. Div. of Corr.*, No. PWG-14-3312, 2015 WL 5124103, at *6 (D. Md. Aug. 28, 2015) (stating that the mere fact that a warden denied grievances, without more, does not alone establish liability). Because the Motion will be granted as to the Correctional Defendants, the Court need not address their remaining claims.

### III. The Medical Defendants

#### A. Wexford

During the time covered by the Complaint, and prior to January 1, 2019, Defendant Wexford was a private health care provider under contract with the Maryland Department of Public Safety and Correctional Services ("DPSCS") to provide primary health care services for Maryland prisoners. Wexford asserts that the claims against it must be dismissed because there is no supervisory liability under § 1983.

As discussed above, there is no vicarious liability under § 1983. Instead, § 1983 requires a showing of that a defendant acted personally in the deprivation of rights. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). A corporation in a role such as that held by Wexford may be held liable under § 1983, but only if the claim is based on a custom or policy of violating constitutional rights. *Austin v. Paramount Parks*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). Where Certeza has not alleged or identified unconstitutional policies and procedures that were the motivating force behind the alleged inadequate medical care he received, his claims against Wexford will be dismissed.

#### B. Statute of Limitations

The Medical Defendants argue that any allegations of misconduct occurring before June 15, 2015 cannot proceed because they occurred outside the statute of limitations for personal injury torts. To determine the statute of limitations for § 1983 claims, courts look to the state law

limitations period for personal injury torts. *Wallace v. Kato,* 549 U.S. 384, 387 (2007) (citations omitted). In Maryland the general statute of limitations for civil actions is three years from the date of the occurrence. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2013). In cases of medical malpractice where the injury is not detected immediately, the victim has within the earlier of five years from the time the injury was committed, or three years from the date from which the injury is discovered, to file suit. *See id.* § 5-109(a)(1), (2). Here, Certeza signed his Complaint on June 13, 2018 and it was docketed on June 15, 2018. Under the "prison mail box rule," the Complaint is deemed filed as of June 13, 2018. *See Houston v. Lack,* 487 U.S. 266, 270–72 (1988); *Lewis v. Richmond Police Dep't,* 947 F.2d 733, 735 (4th Cir. 1991) (applying *Houston* to claims under § 1983). Thus, under any application of the statute of limitations, any claims arising on or after June 13, 2015 would not be time-barred.

It is undisputed that Certeza's injury occurred on May 20, 2015, that a fracture was diagnosed the following day, May 21, 2015, and that a consultation request for an evaluation by an orthopedic surgeon followed. During the June 5, 2015 orthopedic consultation at Bon Secours Hospital, Dr. Krishnaswamy determined that Certeza would require surgery. The consultation request seeking approval for the surgery was submitted on June 17, 2015 but not approved until July 22, 2015. The surgery was not performed until September 1, 2015.

Certeza alleges that it was the delays in providing surgery that began the cascade of events that led to his present deformity. As of June 13, 2015, when the request for authorization for surgery had not yet been submitted, there is no basis to claim that Certeza's claim of deliberate indifference to his medical needs had already accrued. Thus, the Court cannot conclude that Certeza's deliberate indifference claim falls outside the limitations period.

## C. Deliberate Indifference

Certeza asserts that the Medical Defendants violated the Eighth Amendment through deliberate indifference to his serious medical needs. In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This standard requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the

15

appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Here, the Medical Defendants argue that Certeza's Eighth Amendment claim does not meet the standard for deliberate indifference in that the record does not show that they intentionally denied necessary medical care or that the treatment rendered was grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. It cannot fairly be disputed that Certeza's wrist injury, which caused serious, ongoing pain and has resulted in a likely permanent deformity, constituted an objectively serious medical need. As for whether the Medical Defendants were subjectively aware of an "excessive risk posed by the official's action or inaction," *Farmer*, 511 U.S. at 837, the record here establishes that soon after Certeza's injury in May 2015, Dr. Krishnaswamy, the orthopedist, determined that Certeza would need surgery and that in the absence of prompt treatment, the injury would heal improperly and could result in a permanent deformity. Although Dr. Krishnaswamy stated that to avoid such an outcome, surgery should occur as soon as possible, the initial surgery did not take place until September 2015, three months after surgery was first recommended. Although the surgery was successful in one sense, Dr. Krishnaswamy determined that the plate and screws inserted the first surgery should be removed in four to six months and suggested as early as November 2015 that additional surgery to reconstruct the joint may be required.

Certeza then endured a period during which he was in significant pain whenever he used his wrist. Although another consultation with Dr. Krishnaswamy was requested in May 2016, it took almost eight months, until January 2017, until the consultation took place. At that point, Dr.

Krishnaswamy made a specific request for surgery to address Certeza's wrist deformity, pain, and joint instability. Inexplicably, no surgery occurred during all of 2017, and in January 2018 Dr. Krishnaswamy was engaged for another consultation when he again recommended surgery. Contrary to his recommendations, the procedure that occurred in April 2018 was limited to removing the hardware from the first surgery, which was supposed to occur approximately two years earlier, and did not include the Darrach Procedure recommended by Dr. Krishnaswamy. Thus, by the time that Certeza filed his Complaint in June 2018, he had endured a period of over three years, since the original injury in May 2015, during which he was in pain, could not use his wrist properly, and did not receive surgical procedures explicitly recommended by an orthopedist to address these issues and avoid permanent damage. Then, in September 2018, Dr. Manning, another orthopedist, identified a shortening of Certeza's radius bone and recommended the same or a similar procedure to that first sought by Dr. Krishnaswamy in January 2017, more than 20 months before. Where Dr. Krishnaswamy had originally noted that delays in surgery could jeopardize the full healing of Certeza's wrist, it could reasonably be inferred that the extensive delays contributed to permanent deformity in his wrist.

Viewing these facts in the light most favorable to Certeza, the Court finds that there is at least a genuine issue of material fact whether the Medical Defendants had actual knowledge of an excessive risk to Certeza's health and thus acted with deliberate indifference when they failed to provide the recommended procedures to heal his wrist. Where Dr. Krishnaswamy's recommendations were consistent, clearly documented in the medical records, were later corroborated by Dr. Manning, and have not been seriously challenged, it would be fair to infer to the Medical Defendants had actual knowledge of the risk to Certeza of inaction for much of the multi-year period of inaction. Where the Medical Defendants nevertheless failed to act upon that

knowledge and instead allowed interminable delays in treating an injury for which lack of immediate attention was known to risk permanent injury, the Court concludes that there remains a genuine issue of material fact on the issue of deliberate indifference. The Motion for Summary Judgment must therefore be denied.

Because Certeza may continue to advance his underlying constitutional claim against the Medical Defendants, the Court need not address whether to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any gross negligence claim asserted by Certeza.

### D. Specific Defendants

Defendants PA Jamison, Dr. Stallworth, and Dr. Memarsadeghi argue that regardless of whether an Eighth Amendment claim is viable, their limited contacts with Certeza are insufficient to support an inference that they are liable under § 1983. As to PA Jamison, Certeza does not make any specific allegation that she acted to deprive him of constitutionally adequate and professionally correct care. Further, the record evidence instead reflects that Jamison regularly provided care to Certeza and at least once questioned why consultation requests were not acted upon. Where Certeza has no specific allegations as to inadequate care provided by PA Jamison and the record provides no basis for such an inference, PA Jamison will be dismissed as a defendant. Because Certeza has not engaged in discovery, the claim against PA Jamison will be dismissed without prejudice.

Although Dr. Stallworth had limited contact with Certeza, she examined him on several occasions and was aware of his injury and significant wrist pain no later than August 2016. Although she recommended that he have a consultation with an orthopedist, and had access to his medical records, there is no evidence that she took action to advance the surgical treatment, even after she saw Certeza again in October 2017 and he had yet to have any additional procedures.

Moreover, Dr. Stallworth was actively involved in the provision of pain medication to Certeza that failed to resolve his pain and, on one occasion, resulted in a finding by the Warden that an ARP complaining about lapses in pain medication was meritorious.

For his part, Dr. Memarsadeghi participated in the January 2017 consultation in which there were discussions about the removal of the surgical plate and a possible need for Darrach Procedure surgery, such that Dr. Memarsadeghi was aware of Dr. Krishnaswamy's recommendation. Yet nothing occurred for over a year, until there was repeat consultation among Certeza, Dr. Memarsadeghi, and Dr. Krishnaswamy in March 2018 which again resulted in a recommendation of a Darrach Procedure that had not occurred by the time of the filing of the Complaint. Under these facts, where both Dr. Stallworth and Dr. Memarsadeghi were directly involved in the medical care, or lack of medical care, relating to Certeza's wrist injury, and were aware of the delays in fulfilling his surgical needs, the Court will deny summary judgment in their favor on the deliberate indifference claim.

## IV. Appointment of Counsel

Certeza is a self-represented, incarcerated litigant who is proceeding *in forma pauperis*. Because this case will proceed to discovery and involves complex medical issues, and in light of Certeza's continued incarceration, the Court finds that it would be infeasible for Certeza to conduct this litigation without assistance. The Court will therefore appoint counsel to represent Certeza in this matter. *See* 28 U.S.C. § 1915(e)(1) (2012) (stating that "[t]he court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel").

## CONCLUSION

For the foregoing reasons, the Correctional Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, will be GRANTED, and the Correctional Defendants

will be DISMISSED as Defendants. The Medical Defendants' Motion to Dismiss or, in the Alternative, a Motion for Summary Judgment, will be GRANTED IN PART and DENIED IN PART. It will be GRANTED to the extent that the claims against Defendant Wexford will be DISMISSED and the claims against Defendant PA Jamison will be DISMISSED WITHOUT PREJUDICE. The Motion will otherwise be DENIED. A separate Order shall issue.

Date: September 9, 2019



THEODORE D. CHUANG
United States District Judge