## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SEAN CERTEZA, #411779
    Maryland Correctional Institute-
    Hagerstown
    18601 Roxbury Road
    Hagerstown, MD 21746

        Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
    501 Holiday Drive, Suite 300
    Pittsburgh, PA 15220

DR. ASHOK KRISHNASWAMY,
    7102 Ritchie Hwy
    Glen Burnie, MD 21061

ERWIN ALDANA, M.D.,
    11236 Robinwood Drive Suite 101
    Hagerstown, MD 21742

ASRESAHEGN GETACHEW, M.D.,
    7120 Samuel Morse Drive, Suite 140
    Columbia, MD 21046

MAHBOOBEH MEMARSADEGHI, M.D.,
    18701 Roxbury Road
    Hagerstown, MD 21746

MONICA STALLWORTH, M.D.,
    18601 Roxbury Road
    Hagerstown, MD 21746

COLIN OTTEY, M.D.,
    249 Henderson Ave
    Cumberland, MD 21502

DOLPH DRUCKMAN, M.D.,
    c/o Wexford Health Sources, Inc.
    501 Holiday Drive, Suite 300
    Pittsburgh, PA 15220

        Defendants.

Case No. 8:18-cv-01791-TDC

# FIRST AMENDED COMPLAINT

1.      On May 20, 2015, Plaintiff Sean Certeza ("Plaintiff") broke his left wrist while incarcerated at Roxbury Correctional Institute in Hagerstown, Maryland.  X-ray images taken on May 21, 2015 showed that Plaintiff had suffered an acute fracture of his radius.  More than two weeks after his injury, on June 5, 2015, Plaintiff was seen by an orthopedist, Defendant Dr. Ashok Krishnaswamy ("Dr. Krishnaswamy"), who advised Plaintiff that he would need to have surgery "[as] soon as possible as it will heal in malunion" otherwise.

2.      Nonetheless, Plaintiff did not have surgery to repair his wrist fracture until three months later, on September 1, 2015.  By that time, Plaintiff's wrist was already "healing in malunion."  As a result of the delay before Plaintiff's surgery, the surgery was more complex and the chances of a successful outcome were greatly decreased.  Dr. Krishnaswamy, who performed the September 1, 2015 surgery, was deliberately indifferent to the complications posed by the delay and performed the surgery inadequately.

3.      For at least the next four years, Plaintiff experienced extreme pain and deformity as a result of the delay before his surgery, the incorrectly performed surgery, and additional delay.  Plaintiff was supposed to have the hardware in his wrist removed four to six months after his initial surgery, but his second surgery was not scheduled until April 12, 2018—two and a half years after his initial surgery.  During that time, Plaintiff constantly complained of chronic wrist pain and frequently requested the medical care that he was due.

4.      Plaintiff ultimately had to have two additional surgeries to fix his deformed wrist. He continues to experience pain and limitation of movement.

5.      From at least 2015 to December 31, 2018, Defendant Wexford Health Sources, Inc. ("Wexford") was under contract with the state of Maryland to provide medical services to

Maryland prisoners. As such, Defendant Wexford and its employees acted under color of state law.

6. Wexford had a policy or custom of routinely delaying prisoners' necessary and important medical care, including by delaying prisoners' visits to outside physicians and by failing to respond urgently to prisoners' emergent medical needs. This policy represents a deliberate indifference to serious medical needs of prisoners like Plaintiff. As a result of this custom or policy, Plaintiff received delayed and constitutionally insufficient medical care.

7. Accordingly, Plaintiff brings this action against Wexford, its employees, and its contractor Dr. Krishnaswamy for compensation for the pain and suffering he has needlessly experienced and will continue to experience.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983.

9. The District of Maryland is a proper venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Maryland.

10. The Court has personal jurisdiction over all Defendants because they caused Plaintiff tortious injury in the state of Maryland.

11. This Court also has personal jurisdiction over Defendant Wexford because it transacted and performed business in Maryland and contracted to supply services in Maryland.

12.     Upon information and belief, this Court also has personal jurisdiction over Defendants Drs. Krishnaswamy, Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman because they are persons domiciled in the state of Maryland.

## PARTIES

13.     Plaintiff Sean Certeza is a Maryland resident currently incarcerated at the Maryland Correctional Institute—Hagerstown ("MCIH").  From at least 2015 to 2019, Plaintiff resided at Roxbury Correctional Institute ("RCI").

14.     Defendant Wexford Health Sources, Inc. is a Florida corporation with its principal place of business in Pennsylvania.  At all relevant times, Wexford carried on regular business in Maryland and had a contract with the Maryland Department of Public Safety and Correctional Services to provide medical care to inmates in Maryland prisons.

15.     Defendant Ashok Krishnaswamy, M.D. is a physician licensed to practice medicine in the state of Maryland.  Dr. Krishnaswamy has a specialty as an orthopedic surgeon. Upon information and belief, at all relevant times, Dr. Krishnaswamy worked at Grace Medical Center, f/k/a Bon Secours Hospital.  Dr. Krishnaswamy provided medical care to Maryland state prisoners, including Plaintiff, as an offsite provider and contractor to Wexford.  Dr. Krishnaswamy was not employed by Wexford.

16.     Defendant Asresahegn Getachew, M.D. ("Dr. Getachew") is a physician licensed to practice medicine in the state of Maryland.  At all relevant times, Dr. Getachew was an employee of Wexford.  Upon information and belief, Dr. Getachew had decision-making authority over Plaintiff's medical care while Plaintiff was incarcerated at RCI.  Dr. Getachew had the ability or played a part in the decision to authorize, deny, or delay Plaintiff's necessary

medical care. Upon information and belief, Dr. Getachew actually used the authorization process to delay Plaintiff's necessary medical care.

17.     Defendant Colin Ottey, M.D. ("Dr. Ottey") is a physician licensed to practice medicine in the state of Maryland. At all relevant times, Dr. Ottey was an employee of Wexford. Upon information and belief, Dr. Ottey was the Regional Medical Director at RCI during 2015 and had the ability or played a part in the decision to authorize, deny, or delay Plaintiff's necessary medical care. Dr. Ottey actually examined Plaintiff's injuries after he broke his wrist on May 20, 2015 and failed to ensure that Plaintiff received the medical care he urgently needed.

18.     Defendant Dolph Druckman, M.D. ("Dr. Druckman") is a physician licensed to practice medicine in the state of Maryland. At all relevant times, Dr. Druckman was an employee of Wexford. Upon information and belief, Dr. Druckman was the Acting Regional Medical Director at RCI during 2015 through 2017, and had the ability or played a part in the decision to authorize, deny, or delay Plaintiff's necessary medical care.

19.     Defendant Mahboobeh Memarsadeghi, M.D. ("Dr. Memarsadeghi") is a physician licensed to practice medicine in the state of Maryland. At all relevant times, Dr. Memarsadeghi was an employee of Wexford. Dr. Memarsadeghi actually examined Plaintiff's injuries and failed to ensure that Plaintiff received the medical care he urgently needed. Dr. Memarsadeghi was deliberately indifferent to Plaintiff's serious medical need.

20.     Defendant Monica Stallworth, M.D. ("Dr. Stallworth") is a physician licensed to practice medicine in the state of Maryland. At all relevant times, Dr. Stallworth was an employee of Wexford. Dr. Stallworth actually examined Plaintiff's injuries and failed to

ensure that Plaintiff received the medical care he urgently needed. Dr. Stallworth was deliberately indifferent to Plaintiff's serious medical need.

21. Defendant Erwin Aldana, M.D. ("Dr. Aldana") is a is a physician licensed to practice medicine in the state of Maryland. At all relevant times, Dr. Aldana was an employee of Wexford. Dr. Aldana has been the Regional Medical Director at RCI and MCHI since August 2017 and had the ability or played a part in the decision to authorize, deny, or delay Plaintiff's necessary medical care.

## FACTUAL ALLEGATIONS

### I.  Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs

22. On May 20, 2015, Plaintiff broke his left wrist while playing softball at Roxbury Correctional Institute ("RCI"). He was taken to the Office of Inmate Health Services ("OHS"). A nurse inspected his wrist and determined that he had a radius fracture. She splinted his wrist and gave him pain medicine.

23. The following day, on May 21, 2015, Plaintiff returned to OHS. He was examined by Dr. Ottey. Plaintiff reported that, on a scale of ten, his pain level was at ten. An X-ray was taken of his wrist, which confirmed that he had acutely fractured his left wrist. Plaintiff was informed that he would need to have a consultation with an orthopedic specialist.

24. While waiting for his initial appointment with an orthopedist, Plaintiff complained to Wexford and its employees regarding his pain. For example, on May 26, 2015, he submitted a Sick Call Request requesting additional pain medication. He wrote that it had been a week since his wrist was broken, it still had not been set, and he suffered "constant pain and throb[b]ing."

25.     Plaintiff submitted another Sick Call Request on June 3, 2015, this time begging for help:  "My arm has been broke and unseen by a Dr. for 2 WEEKS now.  The pain meds are NOT working.  PLEASE HELP ME!"

26.     Plaintiff had an initial consultation with an orthopedist, Defendant Dr. Krishnaswamy, on June 5, 2015.  Dr. Krishnaswamy examined Plaintiff and concluded that his wrist fracture was unstable and would require surgery.  Dr. Krishnaswamy wrote in his notes that corrective surgery "will be done [as] soon as possible as it will heal in malunion" otherwise.

27.     Despite requiring surgery urgently, Plaintiff then suffered a three-month delay between his initial consultation with Dr. Krishnaswamy and his surgery.

28.     During the three-month delay, Plaintiff submitted multiple Sick Call Requests pleading for relief from the pain caused by his broken wrist.  For example, on June 9, 2015, he submitted a Sick Call Request requesting pain medication.  He noted that he had "a broken arm and no paid meds.  I can't sleep or eat [because] I'm in so much pain.  I really need your help please."  Plaintiff also noted that he was still awaiting proper medical care to treat his broken wrist, writing that he was still waiting to have his wrist fracture set at the hospital.  On July 11, 2015, he submitted another Sick Call Request, this time noting that his left hand "does not work at all."  And on August 17, 2015, he submitted yet another Sick Call Request.  He wrote that his "broken wrist is starting to hurt more than usual and two of my fingers are not working."

29.     Plaintiff's surgery was not even approved until July 22, 2015, more than two months after he broke his wrist and almost two months after Dr. Krishnaswamy examined Plaintiff and determined that he needed surgery "[as] soon as possible."  Defendant Dr. Getachew approved Plaintiff's surgery.

30.     Dr. Krishnaswamy performed surgery on Plaintiff's wrist on September 1, 2015.
Dr. Krishnaswamy performed an open reduction internal fixation ("ORIF") procedure with
compression plate and screws, with splint application.

31.     Dr. Krishnaswamy noted in his pre-operative notes that, by September 1, 2015,
Plaintiff's wrist was already healing in malunion.  The standard of care is to treat acute fractures
urgently because malunion presents challenges in treatment and is substantially more likely to
result in a poorer outcome.  A fracture healing in malunion requires a different and more
complex surgical intervention than an acute fracture.  There is a much lower probability that a
fracture already healing in malunion will have a successful surgical outcome.

32.     The fact that Plaintiff's wrist was healing in malunion at the time of his surgery
greatly reduced Plaintiff's chances to be treated for his broken wrist successfully and without
additional complications, including chronic pain and deformity.  The delay in Plaintiff's surgery
caused him to experience ongoing harm for years following his fracture.

33.     Dr. Krishnaswamy also performed the ORIF procedure in a manner that was
deliberately indifferent to the complications presented by the malunion of Plaintiff's wrist.
Fluoroscopic images taken during and after the procedure show that Dr. Krishnaswamy did not
adequately reduce the fracture or achieve proper alignment during the procedure.  Because of the
inadequacy of the procedure, Plaintiff suffered chronic pain and ongoing complications for years
following the ORIF procedure.  Plaintiff had to have two additional surgeries to correct for the
inadequacy of Plaintiff's initial surgery.

34.     Following Plaintiff's initial, inadequate ORIF procedure, he experienced an
additional, exceedingly lengthy delay in necessary medical care.  Dr. Krishnaswamy informed
Plaintiff that he would remove the plate and screws (which had been installed during the ORIF

procedure) four to six months after the ORIF procedure.  But Plaintiff was forced to wait **two-and-a-half years** to have that procedure performed.

35.     During that excruciatingly long delay, Plaintiff experienced chronic wrist pain, which was caused by the hardware in his wrist.  Plaintiff submitted multiple requests to have his hardware removal surgery that he had discussed with Dr. Krishnaswamy.  He also frequently submitted Sick Call Requests and visited OHS, complaining of wrist pain and pleading for relief from his chronic pain.

36.     For example, on December 1, 2015, Plaintiff visited the infirmary requesting "follow up from offsite ortho [sic] visit."  Plaintiff told Wexford employee Crystal Jamison, PA ("Nurse Jamison") that he was supposed to have a follow-up appointment with Dr. Krishnaswamy "in six months if deformity continues to be bothersome."  No follow-up appointment was made at that time.

37.     On May 23, 2016, eight months after the ORIF procedure, Plaintiff visited OHS again.  At this visit, Plaintiff reported that his writing was "really hhurting.  The motrin doesn't do anything for me.  I cant do anything with my wrist without pain..  If i were to grab for that bottle on your desk, my pain would shoot to about a 10. [sic]"  Plaintiff also explained that, because of the pain, he was having difficulty with basic tasks like tying his shoes and getting dressed.  Plaintiff also reminded the on-site provider that he was supposed to have the hardware in his wrist "removed over a month ago."

38.     Only one week later, on May 31, 2016, Plaintiff visited OHS again, again complaining about his wrist pain.  He told the on-site provider that "he wakes up with pain in the middle of the night and has morning numbness in the left hand."  He once again reminded the on-site provider that he was supposed to have the hardware in his wrist removed "this month."

The on-site provider's notes from this visit note that specialty services (orthopedics) were requested and that the removal of the hardware in Plaintiff's wrist was requested.

39.     Even some of Wexford's employees noticed that Plaintiff's serious medical needs were not being met.  On September 20, 2016, Wexford employee Nurse Jamison followed up on the medical services requested by Plaintiff in May and sent an additional email to the Regional Medical Director and offsite scheduling "to determine if this consult has been addressed."

40.     During this time, Plaintiff was seen by Defendant Dr. Stallworth at least twice, on June 11, 2016 and August 31, 2016.  At both visits, Plaintiff informed Dr. Stallworth about his chronic wrist pain and that he was waiting for follow-up wrist surgery, which should have already occurred.  At the August 31, 2016 visit, Plaintiff reported that his wrist pain "does not go[] below 7/10."

41.     Despite Plaintiff's frequent requests to be seen by Dr. Krishnaswamy for a follow-up appointment, and despite Nurse Jamison's follow-up about Plaintiff's post-operative care, Plaintiff was not approved to have a follow-up orthopedic evaluation until December 14, 2016.

42.     Plaintiff finally had a telemedicine follow-up appointment with Dr. Krishnaswamy on January 17, 2017—more than a year after the ORIF procedure was performed and after Plaintiff's last appointment with an orthopedist, and eight months after Plaintiff was supposed to have the hardware removed.  Defendant Dr. Memarsadeghi was also present for the telemedicine appointment with Dr. Krishnaswamy.

43.     At the January 17, 2017 appointment, Dr. Krishnaswamy confirmed that Plaintiff's wrist fracture had healed and that "most of the pain is coming from the plate and screws."  Dr. Krishnaswamy advised Plaintiff that he would remove the plate and screws from

Plaintiff's wrist and perform another surgical procedure, a Darrach procedure or modified Darrach procedure.

44.     Dr. Memarsadeghi's notes from the January 17, 2017 appointment confirm that the treatment plan would be to have Dr. Krishnaswamy remove the hardware from Plaintiff's wrist and perform a Darrach procedure.  Dr. Memarsadeghi's notes also state that Plaintiff's post-surgical state is "[w]orsening."

45.     Defendant Dr. Getachew approved Plaintiff's hardware removal and Darrach procedure on January 25, 2017.

46.     Shortly after his telemedicine appointment with Dr. Krishnaswamy, Plaintiff visited OHS again on January 27, 2017.  Plaintiff once again complained about his wrist pain. Dr. Memarsadeghi saw Plaintiff on this visit to OHS.  Dr. Memarsadeghi informed Plaintiff that his next surgery had been approved.

47.     Although Plaintiff's hardware removal surgery had been approved, Plaintiff's necessary care continued to be delayed for an additional fourteen months.  During that time, Plaintiff continued to experience chronic pain and to request that the hardware in his wrist be removed.

48.     For example, on June 13, 2017, Plaintiff submitted a Sick Call Request requesting once again to have the hardware in his wrist removed.  He wrote:  "I have some Hardwear [sic] in my wrist thats [sic] supposed to be taken out and I have been waiting months.  My wrist is really bothering me and has multiple problems.  Can you please help me."

49.     Although Dr. Memarsadeghi had been present at Plaintiff's January 17, 2017 appointment with Dr. Krishnaswamy and knew that the surgery had been approved, Dr. Memarsadeghi failed to ensure that Plaintiff received the necessary hardware removal surgery.

Dr. Memarsadeghi also saw Plaintiff several times over the course of the 14-month delay before Plaintiff's hardware removal surgery and knew that the necessary hardware removal surgery had not been scheduled or performed.  On April 12, 2018, Plaintiff finally had a second surgery to remove the hardware in his wrist.[1]

50.  Plaintiff also eventually had to have two additional procedures to correct the deformity in his wrist caused by the grossly inadequate ORIF procedure:  Dr. Krishnaswamy performed the Darrach procedure on April 12, 2018, and removed additional pins in Plaintiff's wrist on August 23, 2019.

51.  As a result of the delay before the ORIF procedure, the inadequately performed ORIF procedure, and the delay before Plaintiff's hardware removal surgery, Plaintiff experienced extreme chronic pain and deformity.

52.  Plaintiff continues to experience limited movement and functionality in his left hand, muscle atrophy and loss of grip strength in his left hand and arm, chronic pain, throbbing and swelling, and difficulty sleeping.  He has also developed osteoarthritis in his left hand as a result of Defendants' inadequate and constitutionally insufficient medical care.

## II.  Wexford's Unconstitutional Customs and Policies

53.  The constitutionally inadequate and exceedingly delayed medical care that Plaintiff experienced while receiving medical care from Wexford was not an isolated incident. Instead, it was consistent with and part of Wexford's official policy or custom of routinely delaying prisoners' necessary and important medical care, including by delaying prisoners' visits to outside physicians and by failing to respond urgently to prisoners' emergent medical needs.

---

[1] Plaintiff decided at this time not to have the Darrach procedure.  He decided to have the hardware removed and see if that alone decreased his pain.  Dr. Krishnaswamy noted in his surgical notes that, if Plaintiff's pain decreased after the hardware removal, Dr. Krishnaswamy would not have to do a Darrach procedure.

Wexford's policy or custom of knowingly and intentionally delaying prisoners' medical care was deliberately indifferent to prisoners', including Plaintiff's, serious medical needs.

54.     Wexford utilizes a multi-step process, known as the "Collegial Review" process, to authorize consultations with outside physicians.  The process is as follows:  a Wexford physician providing direct patient care submits a written request for an outside consult; all written consult requests are referred by scheduling staff to utilization management services for presentation at hearing consult requests on assigned dates; the prison's Regional Medical Director or their designee presents each consult request to the "utilization management physician" so that the Regional Medical Director and the utilization management physician can determine whether to authorize the consult request.  Requests are either authorized, denied, or deferred.

55.     The Collegial Review process injects delay into every step of the process of providing prisoners with necessary and urgent specialty medical care.  Regardless of how urgently the outside consultation is needed, consult requests must go through this time-taking process, including awaiting a scheduled hearing, in order to be approved.

56.     The Collegial Review process also gives Regional Medical Directors (or their designees) decision-making authority regarding whether and how quickly consult requests are approved.

57.     Upon information and belief, Drs. Ottey, Druckman, and Aldana were each employed as the Regional Medical Director or Acting Regional Medical Director of RCI during some portion of the period between 2015 and 2018.  As the Regional Medical Director or Acting Regional Medical Director, Drs. Ottey, Druckman, and Aldana would have been part of the Collegial Review process regarding Plaintiff's necessary medical care.  As such, Drs. Ottey,

Druckman, and Aldana would have had actual knowledge of Plaintiff's serious medical needs and did actually take part in delaying Plaintiff's urgently needed medical care.

58. Wexford is aware that the Collegial Review process is unwieldy and dilatory. In 2014, a court-appointed expert in the Northern District of Illinois found that Wexford's process for providing offsite medical services to inmates resulted in "extraordinary delays." Final Report of the Court Appointed Expert, *Lippert v. Godinez*, No. 10 C 4606, at 29 (N.D Ill. Dec. 2014), available at https://www.uplcchicago.org/file_download/inline/6fbab569-d434-4698-a9d5-c67e7278399d. The expert found "breakdowns in almost every area" of the process of providing offsite medical care, "starting with delays in identification of the need for offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and *delays or the absence of any follow-up visit with the patient*." *Id.* (emphasis added).

59. A second court-appointed expert also found that "[t]he collegial review process of accessing specialty care *is a patient safety hazard and should be abandoned until patient safety is ensured*." *Lippert*, ECF 767 at 10 (N.D. Ill. Nov. 14, 2018).

60. The Collegial Review process is also part of a broader policy or custom at Wexford of responding non-urgently and with exceedingly inadequate haste to prisoners' urgent medical needs.

61. Wexford's custom or policy of routinely delaying Maryland prisoners' medical care, including by responding in a dilatory fashion to prisoners' urgent medical needs, is also evidenced by several other instances in which Maryland prisoners did not receive from Wexford urgently needed medical care.

62.     For example, Jabriel Chase broke his ankle while incarcerated at Western Correctional Institute and under Wexford's medical care in April 2018.  *See Chase v. DPSCS*, No. ELH-18-2182. 2019 WL 4447236 (D. Md. Sept. 17, 2019).  Mr. Chase was seen by an orthopedic specialist, who recommended that Mr. Chase wear a boot to help his ankle heal properly and recommended a follow-up in a month.  Wexford never ordered or gave Mr. Chase a boot, and did not schedule him for a follow-up appointment until four months later, at which point Mr. Chase's ankle had developed into a chronic injury that eventually required corrective surgery.  Defendant Dr. Getachew was also involved in Mr. Chase's delayed and inadequate medical care.

63.     Likewise, from 2016 to 2018, Wexford delayed Nathaniel B. Appleby-El's urgently needed pre- and post-operative ophthalmologic care, resulting in the irreversible loss of sight in his right eye.  *See Appleby-El v. Wexford Health Sources*, No. PWG-19-1868 (D. Md. Jan. 5, 2021).  Similar to Plaintiff's experience with Wexford's wholly deficient post-operative care, after Mr. Appleby-El had surgery to repair a detached retina, Wexford failed to schedule him for a follow-up appointment with an ophthalmologist for an entire year.  During that time, Mr. Appleby-El lost all sight in his eye.

64.     Mark Handy, Jr. experienced a year-long delay in receiving recommended and necessary surgical care while incarcerated at Western Correctional Institution and under Wexford's medical care.  *See Handy v. Clark*, No. 8:19-cv-01200-TDC (D. Md. Sept. 11, 2020).  By the time that Mr. Handy received the surgery to repair his facial trauma, his bones had begun to set and had to be re-broken during the surgery.

65.     Darron K. Green also experienced delayed medical care from Wexford while incarcerated at Central Maryland Correctional Facility in 2015.  *See Green v. Osbu*, No. ELH-

19-2068, 2021 WL 165135 (D. Md. Jan. 19, 2021). From May through September 2015, Mr. Green visited the prison medical department seven times because a nerve stimulator implanted in his leg had stopped working, become infected, and begun protruding from his leg. Wexford employees failed to treat Mr. Green's serious medical condition or to refer him for surgery, which he urgently needed. By the time Mr. Green was transported to an offsite hospital in October 2015, Mr. Green had developed a "severe infection throughout his body." *Id.* at \*3.

66.     The state of Maryland has recognized Wexford's poor care policies. In 2017, the Maryland Department of Public Safety and Correctional Services ("DPSCS") awarded the contract for inmate medical care and utilization management services to a different company. In deciding to award the contract elsewhere, DPSCS noted deficiencies in "Wexford's approach to chronic care, . . . staffing fill rates, . . . and poor data management and verification." *In re Wexford Health Sources, Inc.,* No. MSBCA 3066, 3081, at 10–11 (Aug. 31, 2018). When Wexford challenged the termination of its contract, the Maryland State Board of Contract Appeals affirmed DPSCS's decision. *Id.*

67.     DPSCS has also assessed $15 million in liquidated damages against Wexford over the course of its five-year contract for understaffing and errors in the provision of patient care. *See Duvall v. Hogan*, No. 94-2541, ECF 616 at 10 (D. Md. Dec. 13, 2018).

68.     In addition to the deliberate indifference shown to Maryland prisoners, Wexford has administered constitutionally inadequate medical care to prisoners nationwide.

69.     In 2007, a report by the Mississippi Legislature's Joint Committee on Performance Evaluation and Expenditure Review found that Wexford, which at the time provided medical services to state inmates, "did not ensure that all inmates received timely and adequate access to quality medical care." Joint Committee on Performance Evaluation and

Expenditure Review, *Medical Care for State Inmates: The Department of Corrections' Contract Management and Its Provision of Specialty Medical Care*, at xi (Dec. 11, 2007), https://www.peer.ms.gov/Reports/rpt507.pdf. In particular, the report found that "Wexford did not comply with its own policies and procedures regarding timely access to chronic care and proper documentation of all chronic care follow-up referrals." *Id.* at xiii.

70. In 2013, the Arizona Department of Corrections terminated its contract with Wexford after evidence arose that Wexford was providing Arizona state prisoners with grossly inadequate medical care. *See Parsons v. Ryan*, No. 2:12-cv-00601-NVW, ECF 344 (D. Ariz. Jan. 30, 2013); *Cutting Corners In America's Criminal Justice System*, In the Public Interest, at 8 (Apr. 2016), https://www.inthepublicinterest.org/wp-content/uploads/ITPI_CuttingCorners_Corrections_April2016.pdf.

71. Recent jury verdicts against Wexford also evidence its policy or custom of delaying prisoners' medical care nationwide. For example, William Kent Dean filed suit against Wexford and its employees in 2017 after Wexford delayed the diagnosis and treatment of Mr. Dean's metastatic kidney cancer. *Dean v. Wexford Health Sources, Inc.*, No. 17-CV-3112, 2020 WL 6255323 (C.D. Ill. Sept. 28, 2020). A jury found that Wexford had violated the Eighth Amendment and been deliberately indifferent to Mr. Dean's serious medical needs, awarding Mr. Dean $1 million in compensatory damages and over $10 million in punitive damages.[2] *Id.* at *1.

72. On information and belief, Wexford was aware that it was providing constitutionally inadequate medical care in Maryland, but it failed to address those inadequacies.

---

[2] The court later reduced the award of punitive damages to $7 million and otherwise upheld the jury's verdict. *Dean*, 2020 WL 6255323, at *1.

73.     Wexford's policy or custom, together with its employees' deliberate indifference, deprived Plaintiff of his Eighth Amendment rights to be free from cruel and unusual punishment.

**Count 1**
**(Against Individual Wexford Defendants)**
**Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

74.     Plaintiff incorporates by reference paragraphs 1 through 73.

75.     Drs. Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman acted with deliberate indifference to Plaintiff's serious and known medical needs, thereby depriving him of his constitutional rights under the Eighth Amendment.

76.     Drs. Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman each had actual knowledge that Plaintiff had suffered a serious medical injury, which was evident in Plaintiff's medical records and through Plaintiff's repeated pleas for necessary medical care and pain medication.

77.     Drs. Getachew, Ottey, and Druckman did actually know that Plaintiff had suffered an acute wrist fracture that needed urgent medical care and that, if Plaintiff did not receive adequate medical care for his wrist fracture, it would heal in malunion and lead to complications such as chronic pain and deformity.  Despite that knowledge, Drs. Getachew, Ottey, and Druckman disregarded the substantial risks to Plaintiff's health by delaying the necessary medical care and failing to ensure that Plaintiff was timely examined and treated by an orthopedic specialist.

78.     Drs. Getachew, Aldana, Memarsadeghi, Stallworth, and Druckman did actually know that, within four to six months after Plaintiff's ORIF procedure, he needed to have the hardware in his wrist removed.  Drs. Getachew, Aldana, Memarsadeghi, Stallworth, and Druckman did also actually know that the hardware in Plaintiff's wrist was causing him extreme

chronic pain and deformity. Despite that knowledge, Drs. Getachew, Aldana, Memarsadeghi, Stallworth, and Druckman disregarded the substantial risks to Plaintiff's health by delaying the necessary medical care and failing to ensure that Plaintiff was timely examined and treated by an orthopedic specialist.

79. As a result of Drs. Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman's deliberate indifference to Plaintiff's serious and known medical needs, Plaintiff sustained serious physical and emotional harm. Drs. Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman prolonged Plaintiff's suffering, which included (1) being left untreated for an acute wrist fracture for three months; (2) having his wrist begin to heal in malunion before his wrist fracture was treated; (3) waiting two-and-a-half years to have the hardware in his wrist removed; (4) needlessly suffering from chronic pain and deformity because of the hardware placed in his wrist; (5) experiencing continuing pain and limitations in movement.

80. Each of Drs. Drs. Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman acted under color of state law because they worked for Wexford, which had a contract with the state of Maryland to provide medical care to the Maryland prison system.

### Count 2
### (Against Defendant Wexford)
### Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983

81. Plaintiff incorporates by reference paragraphs 1 through 73.

82. Wexford's customs and policies constituted deliberate indifference to Plaintiff's serious medical needs.

83. Plaintiff's wrist injury, including the acute wrist fracture he sustained on May 20, 2015, was a serious medical need that required evaluation and care by specialists.

84.     Plaintiff's need for adequate post-operative care, including his need to have the hardware in his wrist removed in a timely fashion, was a serious medical need that required evaluation and care by specialists.

85.     Wexford's customs and policies included routinely delaying prisoners' necessary and important medical care, including by delaying prisoners' visits to outside physicians and by failing to respond urgently to prisoners' emergent medical needs.

86.     Drs. Aldana, Getachew, Memarsadeghi, Stallworth, Ottey, and Druckman and others employed by Wexford acted pursuant to these customs and policies in delaying Plaintiff's required care, failing to ensure that Plaintiff received necessary care, and in failing to respond to Plaintiff's serious medical need with sufficient urgency to prevent further injury.

87.     Upon information and belief, Wexford had knowledge of its customs and policies, including that its employees acted upon those customs and policies, and did not take any action to stop or correct these customs and policies.

88.     At all relevant times, Wexford acted under color of state law because it had a contract with the State of Maryland to provide health care to the Maryland prison system.

**Count 3**
**(Against Defendant Ashok Krishnaswamy, M.D.)**
**Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

89.     Plaintiff incorporates by reference paragraphs 1 through 73.

90.     Dr. Krishnaswamy acted with deliberate indifference to Plaintiff's serious and known medical needs, thereby depriving him of his constitutional rights under the Eighth Amendment.

91.     Dr. Krishnaswamy had actual knowledge that Plaintiff had suffered a serious medical injury, which was evident in Plaintiff's medical records and through Dr.

Krishnaswamy's examination of Plaintiff's wrist before and after the ORIF procedure was performed.

92. Dr. Krishnaswamy knew that, by the time that Plaintiff's ORIF procedure was scheduled, Plaintiff's wrist had healed in malunion, meaning that the surgery required to treat Plaintiff's wrist fracture was more complex. Nonetheless, Dr. Krishnaswamy performed the ORIF procedure as though Plaintiff's fracture was acute. Dr. Krishnaswamy's performance of the ORIF procedure was deliberately indifferent to the reality and severity of Plaintiff's injuries. Dr. Krishnaswamy's performance of the ORIF procedures constitutes deliberate indifference to Plaintiff's serious medical need.

93. Dr. Krishnaswamy also knew and recommended that, following Plaintiff's ORIF procedure, the hardware in Plaintiff's wrist should be removed in four to six months. Dr. Krishnaswamy nevertheless allowed two-and-a-half years to pass before removing the hardware in Plaintiff's wrist, including allowing fourteen months to pass after examining Plaintiff on January 17, 2017 and noting the pain caused by the hardware in Plaintiff's wrist. For the vast majority of those fourteen months, Plaintiff's hardware removal surgery was authorized by Wexford.

94. Upon information and belief, Dr. Krishnaswamy had some ability to influence the scheduling of consultations or procedures performed by him upon prisoners in Wexford's medical care, particularly consultations or procedures that had already been authorized by Wexford. After reasonable opportunity for further investigation and discovery, Plaintiff believes that there will be evidence that Dr. Krishnaswamy's failure to ensure that Plaintiff received the post-operative care that he needed constituted deliberate indifference to Plaintiff's serious medical need.

95. As a result of Dr. Krishnaswamy's deliberate indifference to Plaintiff's serious and known medical needs, Plaintiff sustained serious physical and emotional harm. Dr. Krishnaswamy prolonged Plaintiff's suffering, which included (1) the absolutely deficient performance of the ORIF procedure (2) the two-and-a-half year delay to have the hardware in Plaintiff's wrist removed; (3) Plaintiff's needless suffering from chronic pain and deformity because of the hardware badly placed in his wrist; and (4) experiencing continuing pain and limitations in movement.

96. Upon information and belief, Dr. Krishnaswamy acted under color of state law because private physicians who treat state prisoners act under color of state law. *Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment for Plaintiff against Defendants and grant:

A. Compensatory damages in an amount to be proven at trial;

B. Punitive damages;

C. Attorneys' fees and costs under U.S.C. 42 § 1988; and

D. Other such relief at law or in equity to which Plaintiff is entitled or which the Court concludes is just or proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues and claims.

Dated:  August 20, 2021

Respectfully submitted,

s/ Michael J. Baratz

Michael J. Baratz (Bar No. 16391)
Sara Faber (*admitted Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000 (Telephone)
(202) 429-3902 (Facsimile)
mbaratz@steptoe.com
sfaber@steptoe.com

*Attorneys for Plaintiff*